# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WINKLEVOSS CAPITAL FUND, LLC, TYLER WINKLEVOSS, and CAMERON WINKLEVOSS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0398-NAC |
| STEPHEN SHAW, THE WESTERMAN TRUST U/T/D FEBRUARY 25, 2011, and TREATS!, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: March 24, 2024
Date Decided: August 21, 2024

P. Clarkson Collins, Albert J. Carroll, Kirsten A. Zeberkiewicz, MORRIS JAMES LLP, Wilmington, Delaware; Charles J. Harder, Ryan J. Stonerock, Steven H. Frackman, Jordan A. Gonzales, HARDER STONEROCK LLP, Los Angeles, California; *Counsel for Plaintiffs Winklevoss Capital Fund, LLC, Tyler Winklevoss, and Cameron Winklevoss.*

Stephen Shaw, Beverly Hills, California; *Pro Se Defendant.*

**COOK, V.C.**

This case serves as a reminder that although "[y]ou miss 100% of the shots you don't take[,]"sometimes you miss even when shooting at an open net.

The defendants defaulted after ceasing to participate in this litigation and failing to obey orders of this Court. The operative complaint asked only for "compensatory damages in appropriate amounts to be determined at trial[.]" So, after the default, I held a Rule 55(b) hearing to determine the amount of damages. The plaintiffs submitted a sixty-four-page pre-hearing brief, a set of demonstratives, and nearly 200 evidentiary exhibits. They even hired an expert who submitted a report and testified at the hearing.

*What could go wrong?* A lot.

The plaintiffs make two critical errors. First, they seek $1.3 million in "rescissory damages" as their primary damages award. In other words, the plaintiffs changed the remedy they sought in the operative complaint from only seeking "compensatory damages" to seeking both compensatory and rescissory damages. Although a court can award relief after trial that is just, equitable, and potentially different from the remedies specified in the complaint, the same is not true after a default. In that context, Court of Chancery Rule 54(c) prohibits an award that is "different in kind" from what the operative pleading requested. Why? Because a defendant might rationally choose to default and accept the remedy sought. That option reduces the burdens of litigation and the need to adjudicate cases. But if the remedy could change, then a defendant who chose to default could be ambushed. I

1

therefore cannot award rescissory damages because the plaintiffs did not seek that relief in the complaint.

Second, the plaintiffs seek as damages the pro rata value of eight corporate opportunities. But the plaintiffs only value the corporate opportunities based on their gross revenue, not their profits.

This would be a novel and unprecedented method of calculating the damages associated with a corporate opportunity, and I reject it. I would have been prepared to award lost profits, but, with one exception, the plaintiffs did not submit any evidence to support that calculation, thereby failing to meet their burden of proof. The one opportunity for which the plaintiffs provided that evidence shows it generated a net loss.

Notwithstanding these blunders, the plaintiffs prove damages arising from the misappropriation of funds and a breach of contract. They also show they are entitled to reasonable attorneys' fees under a contractual fee-shifting provision.

## I.    FACTUAL BACKGROUND

Once a party defaults, the well-pled facts in the operative complaint are deemed admitted.[1] The facts therefore come from the Verified Amended and

---

[1] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 104–05 (Del. Ch. 2017) ("A default judgment 'deem[s] admitted all the well-pleaded facts in the complaint.'" (quoting *Hauspie v. Stonington P'rs, Inc.*, 945 A.2d 584, 586 (Del. 2008))).

Supplemental Complaint (the "Complaint") and the evidentiary record developed at the Rule 55(b) hearing.[2]

## A.    The Investment

Defendant Treats!, LLC ("Treats") is a Delaware limited liability company that owns and operates *Treats!* ("*Treats!* Magazine").[3]  Plaintiffs describe it as a "fine art print and digital magazine"[4]; it seems to specialize in nude or semi-nude photography.  Defendant Stephen Shaw was Treats' sole member and the publisher and editor-in-chief of *Treats!* Magazine.[5]  In March 2012, Shaw transferred his entire member interest to defendant The Westerman Trust U/T/D February 25, 2011 (the "Trust," together with Treats and Shaw, "Defendants").[6]  Shaw was the Trust's settlor, trustee, and sole beneficiary.[7]

In August 2012, plaintiffs Tyler and Cameron Winklevoss (together, the "Winklevoss Brothers") invested in Treats through their investment fund, plaintiff Winklevoss Capital Fund, LLC ("Winklevoss Capital," together with the Winklevoss

---

[2] *Winklevoss Cap. Fund, LLC v. Shaw*, C.A. No. 2018-0398-NAC, Docket ("Dkt.") 246, Verified Am. and Supp. Compl. ("Am. Compl."); Dkt. 301, Tr. 3-15-2024 Rule 55(b) Evid. Hr'g ("Tr.").  Citations in the form "PX-__" refer to the exhibits the plaintiffs submitted in advance of the Rule 55(b) hearing.

[3] Am. Compl. ¶¶ 1, 10.

[4] *Id.*

[5] *Id.* ¶¶ 17–18.

[6] *Id.* ¶ 19.

[7] *Id.* ¶¶ 9, 19; PX-11.

3

Brothers, "Plaintiffs").[8]   Winklevoss Capital purchased 1,310,000 Series A Convertible Preferred Units (approximately 38.24% of Treats' equity) for $1,310,000 (the "Investment").[9]   The transaction was governed by the Treats!, LLC Series A Preferred Unit Purchase Agreement (the "Purchase Agreement") between Winklevoss Capital, the Trust, and Treats.  Shaw signed for both entities, and he retained the remaining majority member interest through the Trust.[10]

The Purchase Agreement attached as Schedule A the Amended Limited Liability Company Agreement (the "LLC Agreement") that governed Treats' internal affairs.[11]   The LLC Agreement designated Shaw as Treats' sole manager.[12]   After making the Investment, Treats borrowed $20,000 from Winklevoss Capital under a promissory note that called for 2% annual interest (the "2012 Promissory Note").[13]

## B.   The Agreements

The LLC Agreement and Purchase Agreement placed certain restrictions on Shaw and Treats.

- **Intellectual Property:** Section 2.17 and Schedule 2.17 of the Purchase Agreement provide that Treats was the "sole and exclusive owner of, or has

---

[8] Am. Compl. ¶¶ 22, 26.

[9] *Id.*; PX-11.

[10] PX-11.

[11] *Id.*

[12] *Id.* at 76, 110; Am. Compl. ¶¶ 26, 31.

[13] Am. Compl. ¶ 27; PX-23 at 1.  No payments have been made on the 2012 Promissory Note.  *See* Tr. at 40.

4

exclusive license to[,]"[14] among others, the trademarks "treats!" and "t!"[15]  But at the time, the Trust "owned" those trademarks,[16] so Schedule 2.17 required Shaw to "cause the aforementioned trademarks to be assigned to [Treats.]"[17]

- **Entity Separateness:** Section 8.02(c) of the LLC Agreement requires Shaw as manager to "cause [Treats] to conduct its business and operations separate and apart from that of any Member or Manager . . . ."[18]  This provision also expressly prohibits Shaw from causing the comingling of Treats' funds and other assets.[19]  And it requires that Shaw cause Treats to maintain separate books and financial records and conduct business with third parties in its own name.[20]

- **Equity, Asset Sales, and Debt:** Section 4.06(b) of the LLC Agreement provides that "except with the prior approval" from Winklevoss Capital, Shaw "shall not permit or cause [Treats]" to "increase or decrease" the "number of authorized Units of any class or series of Units[,]" enter into the "sale, lease or conveyance of all or substantially all of" Treats' assets, or "incur any indebtedness in excess of the aggregate amount of $250,000.00."[21]

- **No Impairment:** Section 3.03(j) of the LLC Agreement (1) prohibits Treats from taking certain acts to avoid its obligations as set out in the terms of the LLC Agreement and (2) creates an affirmative obligation for Treats to "at all times in good faith assist in . . . the taking of all such action as may be necessary or appropriate in order to protect [Winklevoss Capital] against impairment."[22]

---

[14] PX-11.

[15] *Id.* at 12, 51.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 110–11.

[19] *Id.*

[20] *Id.*  Section 12.05 of the LLC Agreement also provides that "[t]he funds of [Treats] shall not be commingled with the funds of any other Person."  *Id.* at 133.

[21] *Id.* at 98–99.

[22] *Id.* at 93.

- **Attorneys' Fees:** Section 15.15 of the LLC Agreement includes a fee-shifting provision that entitles the "prevailing party" in any action "arising out of or relating to this Agreement" to the payment of its reasonable attorneys' fees.[23]

## C. Fallout

Shortly after the Investment, Shaw and the Winklevoss Brothers begin to clash.[24] On one side, Tyler Winklevoss felt that, despite sharing "alignment on the vision[,]" he and Shaw disagreed on Shaw's "day-to-day decision-making[.]"[25] Shaw, for his part, blamed the Winklevoss Brothers.[26] In particular, Shaw believed the Winklevoss Brothers had an obligation to publicize Treats and generate excitement and brand awareness, which they did not do.[27]

### 1. From Buyout To Shakedown

By mid-2013, Shaw felt stifled. In an email to Tyler Winklevoss, Shaw asserted that he had upheld his end of the bargain. He thought that meant giving the Winklevoss Brothers "the access [they] wanted, introduc[ing them] to the people, the girls[, and] the lifestyle [they] wanted."[28]

---

[23] *Id.* at 143.

[24] Tr. at 45.

[25] *Id.* at 46.

[26] *Id.* at 48.

[27] *See id.*; Am. Compl. ¶¶ 3, 46–48, 82–83; PX-32 ("To be absolutely clear that is why I sold you the stake[]."). Notably, the Purchase Agreement included an integration clause. *See* PX-11 at 24 ("This Agreement and the documents referred to herein constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein or therein.").

[28] PX-32.

But Shaw believed the Winklevoss Brothers had not upheld their end of the deal. Shaw explained that he chose the Winklevoss Brothers as Treats' investors because they "are the founders of Facebook, . . . celebrities in the business and media world[,] and [they] represented tangible value to [Shaw] (someone who is trying to create a brand from a standing start)."[29] Continuing, Shaw wrote that he allowed Winklevoss Capital to invest so that he could "promote, advertise, speak of, network, [and] basically tell the world who [his] new investors / partners were."[30] But that went awry when the Winklevoss Brothers "ma[de] it clear [he] could never say anything of [Winklevoss Capital's] investment."[31]

In May of 2013, Shaw asked about buying out Winklevoss Capital.[32] He suggested the Winklevoss Brothers put "forward an offer" to get the buyout discussions rolling.[33] Tyler Winklevoss proposed a minimum price of $1.3 million.[34] Shaw called the offer "a joke" and declined.[35] He responded that he would "have no choice [but] to hand this over to [his] lawyers if [they] d[id]n't get sensible and fair[]."[36]

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *See id.*; Tr. at 51.

[33] PX-32; Tr. at 51.

[34] *See* PX-32; Tr. at 52–53.

[35] PX-32.

[36] *Id.* This was not the last time Shaw tried to buy out Winklevoss Capital. In November 2013, he wrote that Treats "currently has less than $25,000 cash on hand" and that, coincident with a capital raise, he "would be prepared to buy[]out" their "shares for a

Although the Winklevoss Brothers did not know it at the time, a forensic accountant later determined that Shaw had depleted the Investment funds by June 2013, if not earlier.[37] The forensic accountant concluded that "at least $339,000 of the . . . Investment[] was spent by Stephen Shaw on matters other than the operations of [Treats]."[38]

Having run through the Investment, Shaw began looking for new ways to raise capital. First, he contacted Peter Cohen and painted quite a rosy picture of Treats, claiming it was valued at "around $9 million."[39] No deal materialized.

Shaw's next option was "a shakedown."[40]

In August 2013, Shaw forwarded an email to Paul Kemsley.[41] Tyler Winklevoss had originally sent the email to Shaw in October 2012. In the forwarded email, Tyler Winklevoss asked Shaw to "throw a casting . . . for girls to model at"[42] a promotional 2012 Halloween party for Treats.[43] Tyler Winklevoss wanted Shaw to

combination of $250,000 cash and warrants representing 5% equity in the recapitalized company." PX-37. The Winklevoss Brothers rejected this proposal. *See* Tr. at 62. And in May 2015, Shaw described Treats as "hanging on by a thread & about to go into bankruptcy[,]" then made an offer to buy out Winklevoss Capital for $100,000. PX-55. Winklevoss Capital rejected that offer too. *See* Tr. at 65.

[37] *See* Tr. at 175–76.

[38] PX-125.

[39] *See* PX-33.

[40] Tr. at 70 (Tyler Winklevoss).

[41] *See* PX-20.

[42] PX-21.

[43] *See* Tr. at 40–41.

"let all the girls come[,] call the hot ones up, invite them, and then I can shag them ;)[.]"[44] Tyler Winklevoss later testified that the email was "a joke that Mr. Shaw had talked about with [him] before, and [he] always took it as a joke, and [he was] actually parroting back [Shaw's] joke to him. If [one] look[s] at the vernacular, it's British idiom, idiomatic."[45]

Kemsley thought the email was "gold" and would be "game over" for the Winklevoss Brothers.[46] Shaw responded that "[t]here are SO many like that . . . [a]sking [Shaw] to introduce them to under[]age models[, p]hotograph their girlfriends[, and i]ntroduce them to . . . celebs."[47]

Those emails suggest that Shaw planned to use the emails in conjunction with a buyout offer from a third party to get Winklevoss Capital to sell its equity at a low price. Shaw felt the Winklevoss Brothers would sell because "[t]hey don't want it [to be] public knowledge that they are involved in the company or that they are scumbags looking to get laid."[48]

By September 2013, Shaw believed he found someone "who w[ould] buy out the [the Winklevoss Brothers] . . . ."[49] But the following month, Shaw backed down—

---

[44] PX-21.

[45] Tr. at 161.

[46] *See* PX-21.

[47] *Id.*

[48] PX-35.

[49] *Id.*

pivoting to a new strategy. He would "keep [the Winklevoss Brothers] in & go around them to grow the business."[50]

## 2. Betrayal

Going around the Winklevoss Brothers meant breaching his fiduciary and contractual duties. There was a long list of violations.

### a. The Treats Warrants

First, Shaw borrowed $225,000 from Matthew Gorelick under a loan agreement on January 7, 2014. The agreement also granted Gorelick warrants to purchase 34,257 common units in Treats.[51]

### b. Circus Magazine

Second, Shaw formed another magazine publisher named Circus Media & Publishing Group LLC ("Circus") to publish *Circus* magazine.[52] Although *Circus* magazine was technically distinct from *Treats!* Magazine, Shaw promoted *Circus* using *Treats!* Magazine in ways that harnessed *Treats!* Magazine's reputation and image to benefit Circus and *Circus* magazine.[53] Circus also tried to hire Aubrey Day as its editor, but with Treats paying Day as a consultant.[54]

---

[50] PX-36.

[51] PX-58. The note roughly corresponds to a "Long Term Liabilit[y]" that appears on Treats' 2014 Balance Sheet titled "Loan from Partner - SS." PX-12 at Treats 2014 Balance Sheet. The balance of the liability at the end of 2014 was $233,000. *Id.*

[52] *See* PX-42; PX-43.

[53] *See* PX-156.

[54] *See* PX-44.

10

### c.    The Circus/Treats Deal

Third, through Circus, Shaw borrowed between $625,000 and $1,000,000 from Great Fortune Capital Ltd. ("Great Fortune").[55]  The governing agreements identified Circus—not Treats—as the "sole legal and beneficial owner free from any encumbrances of all intellectual property rights anywhere in the world required to operate the 'Treats' and 'Circus' physical and digital magazines and their respective websites."[56]

The agreements turned out to be part of a larger $2.25 million investment arrangement between Circus and Great Fortune that contemplated an exclusive partnership and Great Fortune becoming a 25% member of Circus (the "Treats/Circus Deal").[57]  Shaw's ultimate plan was for Great Fortune to "own part of [T]reats[,]" but that would not happen "until the [Winklevoss Brothers we]re taken out."[58]

### d.    The 2015 Oscars Party

Fourth, Shaw received "over $240k for the Oscar event in sponsorship & advertising" (the "2015 Oscars Party").[59]  Shaw branded the 2015 Oscars Party as a joint event for both Treats and Circus.  For example, on February 23, 2015, Treats

---

[55] *See* PX-45; PX-53.

[56] PX-45.

[57] PX-53.

[58] *Id.*  Winklevoss Capital did not approve the side deal.  *See* Tr. at 98.

[59] PX-53.  This sum is partially substantiated by three $50,0000 credits to Circus's bank account in February 2015.  PX-75.  These payments correspond to entries in a ledger of "Circus income" from "Event Sponsors."  PX-60.

posted a photo on Instagram of a sign that read "CIRCUS"[60] and bore the caption: "Spotted at the Treats! . . . Sunday Oscars Party at #TreatsVilla . . . Stay tuned! #CircusMagazine . . . #treatsmagazine . . . ."[61]

### e. The Treats Calendar Documentary

Fifth, Shaw developed a plan to set up a new company called "[Steve] Shaw & Co. [("ShawCo")], which w[ould] be a production, events, media & publishing company[.]"[62] Shaw planned to "bring[] circus & treats into" ShawCo,[63] and ShawCo's promotional material and pitch decks relied heavily on the Treats brand.[64] In June 2016, Shaw "signed a big deal with Starz tv [*sic*] network to make an hour documentary on the making of a 2017 calendar" (the "Treats Calendar Documentary").[65] Shaw described the calendar as the "TREATS! 2017 Summer Calendar,"[66] then told one of his accountants that the deal "needs to run through

---

[60] *See* PX-49.

[61] *Id.* (second omission in original).

[62] PX-65.

[63] PX-67; PX-72.

[64] *See, e.g.*, PX-68. For example, in one ShawCo pitch deck, at least thirty of the forty-two slides explicitly reference the Treats brand, magazine, or some business venture. *See id.* On one such slide, titled "Defining Shaw[Co,]" Shaw even describes ShawCo as "building on our own strong foundations and connections to a clearly defined audience of influencers and tastemakers, Treats! is now perfectly positioned to establish itself as the world's leading luxury lifestyle media group[.]" *Id.*

[65] PX-64.

[66] PX-68.

Shaw[Co.]"[67]  ShawCo ultimately received $556,000 attributable to the Treats Calendar Documentary.[68]  None went to Treats.[69]

### f.  The Treats Summer House

Seventh, ShawCo took $170,000 in payments for two events hosted at the "Treats Summer House" in Malibu.[70]  Shaw used his Treats email address to ask an events production company to wire $170,000 to an account for Steve Shaw Photography, Inc. (another of Shaw's entities).[71]  After the payment went through, Shaw recorded it in ShawCo's general ledger.[72]  There is no evidence Treats received any of these funds.[73]

---

[67] PX-67.

[68] Steve Shaw Photography Inc. received a $360,000 check from Starz Entertainment LLC, which Shaw credited to ShawCo.  *Compare* PX-74, *and* PX-75, *with* PX-17 at ShawCo General Ledger.  ShawCo received three payments, each for $57,000, and one for $25,000 that Shaw credited to ShawCo.  *Compare* PX-76, PX-78, PX-79, *and* PX-8, *with* PX-17 at ShawCo General Ledger.  Separately, it seems Taschian recognized the risk of directing the money from the Treats Calendar Documentary to an entity other than Treats.  Taschian cautioned Shaw to "be sure things are resolved with the Treats partners so there wouldn't be an opportunity for them to come after Shaw[Co] (for instance if [Shaw] used the Treats name or any material etc.)."  PX-67.

[69] *See* PX-12 at Treats 2016 General Ledger.

[70] *See* Tr. at 102.

[71] *See* PX-73.

[72] *Compare id.*, *with* PX-17 at ShawCo General Ledger.

[73] *See* PX-12 at Treats 2016 General Ledger.  As with the Treats Calendar Documentary, another of Shaw's accountants, Christine Barton, expressed concern about Shaw's diversion of these funds to one of his own entities instead of Treats.  Barton cautioned that Shaw "should avoid activity under the [ShawCo] name until [he] got something in writing" with the Winklevoss Brothers because she "worr[ied the Winklevoss Brothers] w[ould] claim % ownership for any similarity or reference to Shaw and Treats."  PX-71.

13

### g. Treats Takes on Debt

Seventh, Shaw caused Treats to take on debt, then used the debt to justify a an offer to buy out Winklevoss Capital for $50,000.[74] Shaw indicated that Treats was insolvent and that he thought it was better to "forgive [his] own back-pay and try to continue th[e] endeavor on [his] own" rather than to "formally bankrupt" Treats.[75] Winklevoss Capital rejected the offer.[76]

Treats had a lot of debt, but, according to its financial documents, most of it was owed directly or indirectly to Shaw.

- $313,000 was for "Unpaid Guarantee Due to SS,"

- $228,000 was for "Loan From Partner - SS,"

- $303,133.55 was for "[Circus] Business Loan,"

- $122,985.94 was for a loan from "Steve Shaw Photography," and

- $19,754.86 is for a loan from "Member Steve Shaw."[77]

That left only $14,862.35 in credit card debt and a small business loan as the third-party obligations.[78] The only other identifiable debt was the 2012 Promissory Note.[79]

---

[74] *See* PX-93.

[75] *Id.*

[76] *See* Tr. at 68.

[77] *See* PX-12 at Treats 2017 Balance Sheet.

[78] *See id.*

[79] *See generally* PX-23.

### h.     The 2017 Oscars Party

Eighth, Shaw organized another Oscars party in 2017 (the "2017 Oscars Party") and made arrangements using his Treats email address.[80]   It is unclear whether Treats, Circus, or both were responsible for the event.[81]   Regardless, Treats never received any payments for it.[82]   Instead, ShawCo received $75,000 for the event.[83]

### i.     The Screen Vision Sponsorship

Ninth, in June 2017, Shaw hosted a "lunch & Rosé" event he described as "a soft launch at Cannes Lions of our film brand magazine that will cover movies & high end tv, called *Circus* [magazine.]"[84]   Shaw sent the email from his Treats email

---

[80] *See* PX-83.

[81] Although Shaw later posted footage of the event titled "Circus Magazine Oscar Party 2017," he posted the video from his "TREATS! Media" Vimeo account.  PX-97.  And in 2016, prior to the event, Shaw described his Oscars parties as "TREATS! EVENTS," although he also called the 2017 Oscars Party the "CIRCUS[ ]OSCARS VIEWING PARTY AND OSCARS AFTER HOURS."  PX-68.

[82] PX-12 at Treats 2017 General Ledger.

[83] *See* PX-17 at ShawCo General Ledger; PX-81; PX-84.  Once again, Shaw's accountants expressed concern.  PX-85 (Barton wrote that "[she] had a long chat with Nina yesterday.  She fe[lt] it[ was] imperative that [Shaw] settle and conclude [his] agreement with the [Winklevoss Brothers] before signing anything, either personally or with the other entities.  She felt there is a strong argument that the Treats brand helped with the success of the others, and that [Shaw was] attempting to take income from Treats/them.").

[84] PX-88.

15

address.[85]  Screen Vision Media sponsored the event and paid $100,000 to Circus (the "Screen Vision Sponsorship").[86]  Treats again received none of the revenue.[87]

## D.     Shaw's Threats of Litigation Cause the Winklevoss Brothers To Sue

In 2018, Shaw threatened to sue the Winklevoss Brothers in an effort to pressure them to abandon their stake in Treats.  Acting at Shaw's direction, lawyers told the Winklevoss Brothers "to walk away from [their] equity" and "pay Mr. Shaw $10 million," or else Shaw would file a lawsuit.[88]  Shaw's leverage came from having "incriminating video, pics, and emails of the guys asking to get laid."[89]  Shaw thought that because Winklevoss Capital was purportedly "in the middle of a [$]100 mill[ion] media deal," the Winklevoss Brothers "w[ould] cut a check for [$]10 mill[ion] to make [the lawsuit] go away."[90]

But the Winklevoss Brothers did not succumb to Shaw's threats.[91]  Instead, they filed this lawsuit in June 2018.[92]

---

[85] *See id.*

[86] *See* PX-86; PX-89.

[87] PX-12 at Treats 2017 General Ledger.

[88] Tr. at 69–70.

[89] PX-98.

[90] *Id.*

[91] *See* Tr. at 70.

[92] Dkt. 1, Verified Compl. ("Original Compl.").

**E. Shaw Engages In More Self-Dealing**

After the Winklevoss Brothers sued, Shaw canceled the trademarks "t!" and "treats!" He had never caused the Trust to assign those marks to Treats as called for by the Purchase Agreement.[93]

In 2020, a new, UK-based entity, Treats Media UK Ltd. ("Treats UK") registered a trademark in the United Kingdom, identical to the old "treats!" trademark.[94] Treats UK was incorporated two days before it registered the trademark.[95] Shaw was its only officer.[96] In 2022, Shaw registered a new trademark, "TREATS!" and assigned it to ShawCo.[97] Then, in 2023, Treats UK sought three more UK trademarks: "treats," "treats+," and "Treats."[98] Those efforts coincided with Treats UK launching a new, online venture called treats+.[99]

Around the same time Treats UK registered the "treats!" trademark, Shaw wired a total of $40,000 from Treats to ShawCo (the "2020 Wires"),[100] referencing an outstanding loan.[101] Shaw also routed other payments to ShawCo. In 2021, ShawCo

---

[93] *See* PX-127; PX-128.

[94] *See* PX-131.

[95] *See* PX-122.

[96] *See id.*

[97] *See* PX-129.

[98] PX-139.

[99] *See* PX-141; PX-134; PX-133.

[100] *Compare* PX-131, *with* PX-102, PX-103, *and* PX-104.

[101] *See* PX-102; PX-103; PX-104.

17

received a total of $195,000 from Synapse Financial Technologies (the "2021 Wires"),[102] apparently for marketing and content creation.[103] And in early February 2022, ShawCo received $60,000 from Rpz La LLC,[104] a business in the "restaurant/nightclub" industry (the "2022 Wires").[105] But rather than payments for work for ShawCo, the payments seem to relate to a Super Bowl Party at MainRo associated with Treats.[106]

## F.  Procedural History

After filing the original complaint,[107] Plaintiffs conducted extensive discovery. They deposed Kemsley and Gorelick, Shaw's accountants (Taschian and Barton), and his business associates (Severs and Day).[108]  Plaintiffs also obtained a lot of

---

[102] *See* PX-105; PX-107; PX-109; PX-120.

[103] PX-105 at 1; PX-107; PX-120.

[104] PX-113.

[105] PX-152.

[106] The party is documented by three separate posts tagging Treats' Instagram account and including corresponding brand-related hashtags. *Compare* PX-114, PX-115, *and* PX-116, *with* PX-113. Moreover, the name, "MainRo," appears to be a play on words of the first name of the sole person linked to Rpz LA LLC, *Romain* Zago. PX-152. Further connecting Treats to Zago, "@treatsmag" commented on one of the three Instagram posts, tagging "@romainzago[.]" PX-116. Separately, ShawCo received an unidentified amount of revenue through a venture called NuMuses. *See, e.g.*, PX-102; PX-104. In March 2018, Barton wrote Taschian that ShawCo "[wa]s receiving . . . orders for NuMuses." PX-98.

[107] Original Compl.

[108] *See* Dkt. 291, Pls.' Pre-Evid. Hr'g Br. ("Pls.' Br.") (citing to deposition transcripts for these individuals).

18

documents. Despite Shaw's resistance,[109] Plaintiffs secured electronically stored information from Shaw's email addresses and devices.[110]

Then, in February 2023, Shaw stopped participating in this action. The week of his scheduled deposition, roughly six weeks before the planned start of trial, Shaw fired Defendants' counsel and asked for thirty days to retain new counsel. I granted that request, but explained in my order that Treats and the Trust "will not be permitted to proceed in this action except through counsel" and that their "failure to have counsel enter" an appearance "within 30 days may subject [them] to a motion for default judgment."[111] Shaw failed to retain new counsel for himself or the entities,[112] and he never sat for a deposition—even after I ordered it.[113]

---

[109] *See* Dkt. 44, Pl. Winklevoss Cap. Fund, LLC's Mot. Compel Further Produc. Docs. (explaining production deficiencies).

[110] *See* Dkt. 65, Stip. and Order Governing "Quick Peek" Treatment of Select Docs.

[111] Dkt. 225, Order Granting Mot. Withdraw at 2; *see* Dkt. 221, Mot. Withdraw as Counsel for Defs. ¶¶ 2–3, 6; Dkt. 228, Tr. of 2.28.23 Telephonic Status Conf. and Ruling on Mot. Withdraw as Counsel at 6, 9–10.

[112] *See* Dkt. 290, Tr. 11-14-2023 Oral Arg. Pls.' Mot. Default J. ("Default J. Tr.") at 7.

[113] *See id.* at 32. Shaw failed to sit for his ordered deposition despite substantial efforts by Plaintiffs (and this Court) to accommodate his purported travel hurdles. *See id.* ("[E]ven despite having given him ample opportunity to sit for his deposition, Mr. Shaw did not do so. The record reflects that he had clear notice of his obligations" but "[h]e failed to comply."); Dkt. 251, Order Granting Pls.' Mot. Compel Def. Stephen Shaw to Appear for Dep. at 3 (permitting deposition by Zoom or at a mutually agreed upon location); Dkt. 257, Tr. 6-7-2023 Telephonic Hr'g Re Mot. Compel and Rulings of Ct. at 28–30 (same); Dkt. 271, Pls.' Mot. for Default J. ("Mot. Default J.") Ex. 12 (Plaintiffs offering to meet Shaw anywhere in the world to depose him). *Compare* Mot. Default J. Ex. 6–7 (Shaw representing he was unable to travel internationally from the United Kingdom to sit for deposition due to "passport issues"), *with id.* Ex. 19 (suggesting Shaw was traveling internationally).

A few months later, Plaintiffs filed the operative Complaint. It asserts four claims: Count I for breach of contract arising from the Purchase Agreement and the LLC Agreement; Count II for breach of contract arising from the 2012 Promissory Note; Count III for breach of fiduciary duty against Shaw; and Count IV for declaratory relief.[114] Plaintiffs also added a variety of factual details gleaned from discovery.[115]

Defendants never answered the Complaint.[116] Plaintiffs accordingly moved for default judgment.[117] On November 14, 2023, after due notice, I held a hearing, and Shaw did not attend.[118] At the hearing, I found Shaw in default, citing his failures to answer the Complaint, to appear for his deposition, and to obey the orders and deadlines of this Court.[119] I also found Treats and the Trust in default for their prolonged failure to obtain counsel.[120]

---

[114] *See* Am. Compl. ¶¶ 56–80.

[115] *See, e.g., id.* ¶¶ 1, 36, 39, 41, 42, 63.

[116] *See* Default J. Tr. at 32–33 ("Plaintiffs filed an amended complaint. And I entered an order setting a deadline for the defendants in this matter to answer the amended complaint. There was clear notice of the obligation, and no answer has been filed. Indeed, no counsel has entered an appearance on behalf of the entity defendants in this matter as replacement counsel, let alone answered the amended complaint on behalf of the entity defendants.").

[117] Mot. Default J.

[118] *See* Default J. Tr. at 28 ("No representative of the defendants is present today. Neither Mr. Shaw nor counsel for the entity defendants is present, and no meaningful objection papers have been submitted.").

[119] *See id.* at 28–36.

[120] *See* Dkt. 285, Order and Entry of Default J. Against Defs.; Default J. Tr. at 28–35.

20

On March 15, 2024, I held a Rule 55(b) hearing to determine the amount of damages.[121] Shaw appeared pro se. Despite having failed to meet any of the requirements to participate at the hearing, I permitted Shaw to cross-examine Plaintiffs' witnesses.[122]

## II. LEGAL ANALYSIS

Court of Chancery Rule 55(b) provides as follows: "[I]f, in order to enable the Court to enter [default] judgment or to carry it into effect, it is necessary to take into account or to determine the amount of damages . . . , the Court may conduct such hearings or order such references as it deems necessary and proper."[123]

"Typically, the sole focus . . . is the amount of damages owed to the plaintiff, which is determined by the trial court judge."[124] "The Court's findings on damages are based on a preponderance of the evidence."[125] Under that standard, "evidence

---

[121] I entered a scheduling order governing the Rule 55(b) hearing on December 1, 2023. *See* Dkt. 289, Sched. Order Governing Evid. Hr'g. Shaw was aware of the deadlines set out therein since Plaintiffs served copies of the order on Defendants and emailed a copy of the order to Shaw. *See* Dkt. 296, Aff. Albert J. Carrol Re Service of Sched. Order Governing Evid. Hr'g. Shaw responded to the email: "Frackman[,] GO F**K YOURSELF." *Id.* Ex. C.

[122] *See* Tr. at 15–17.

[123] *Tack v. Lipetz, Tr. of Mary Meade Lipetz Revocable Tr. Dated Dec. 6, 2007, as Amended & Completely Restated on June 3, 2010*, 2021 WL 4595660, at *3 (Del. Ch. Oct. 6, 2021) (alterations in original) (quoting Ct. Ch. R. 55(b)).

[124] *Id.*

[125] *Id.*

21

that is unrebutted when presented by one side should be considered conclusive."[126] But a plaintiff cannot recover on claims that are legally insufficient.[127]

Plaintiffs bear the burden of proving damages.[128] "[T]he quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage[,]" but "the court may not award damages based on mere speculation or conjecture where a plaintiff fails adequately to prove damages."[129] That does not mean a party must prove damages with scientific precision. Where the amount of damages is unclear, "[r]esponsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate."[130] But a failure to "connect[] the dots between the harms" suffered and "the causes of action" proves fatal to a plaintiff seeking a damages judgment.[131]

---

[126] *Paton v. Yancy*, 2014 WL 4674600, at *2 (Del. Super. Sept. 22, 2014) (cleaned up) (quoting *Amalfitano v. Baker*, 749 A.2d 575, 578 (Del. 2001)).

[127] *See Hauspie*, 945 A.2d at 586 ("[T]he effect of a default in answering . . . is to deem admitted all the well-pleaded facts in the complaint. A plaintiff is only entitled to a default judgment if those facts, taken together, state a claim upon which relief can be granted."); 10A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2688.1 (4th ed. 2014) [hereinafter Wright & Miller] ("[I]t remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law.").

[128] *See Dill v. Dill*, 2016 WL 4127455, at *2 (Del. Super. Aug. 2, 2016).

[129] *Sullivan v. Watson*, 2023 WL 3487773, at *2 (Del. Super. May 16, 2023) (ORDER) (footnotes and internal quotation marks omitted).

[130] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 (Del. Ch. Feb. 27, 2020).

[131] *See Sullivan*, 2023 WL 3487773, at *3–4 (finding "no basis to award damages").

Those standards apply even to a proven breach of the duty of loyalty, for which "recovery is 'not to be determined narrowly'"[132] and "[a]ny uncertainty in awarding damages is resolved against the wrongdoer."[133] Notwithstanding the burden-shifting implications of the entire fairness test, to "obtain a meaningful remedy for a breach of duty," the burden of showing damages arising from the breaches remains with the plaintiff.[134] Thus, "[i]t remains the law . . . that 'when acting as the fact finder, this

---

[132] *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at \*19 (Del. Ch. Mar. 21, 2018) (quoting *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996)) (rejecting request for compensatory damages for failure to present evidence to support such award after determination of breach of loyalty), *aff'd*, 210 A.3d 705 (Del. 2019).

[133] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at \*50 (Del. Ch. July 12, 2010).

[134] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022) ("To obtain a meaningful remedy for a breach of duty, a plaintiff must establish by a preponderance of the evidence either that the plaintiff suffered harm or that the fiduciary wrongfully received a benefit. A plaintiff also must prove by a preponderance of the evidence that a sufficient causal linkage exists between the breach of duty and the remedy sought to make the remedy an apt means of addressing the breach."); *see also Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at \*19 (Del. Ch. June 23, 2021) (explaining that "[i]n a fiduciary duty action, 'plaintiffs need not plead (or prove at trial) that they have been injured as an element of their claim[,]'" but, "[i]n the absence of sufficient proof of a specific injury, the court will issue a declaration that the defendant breached his fiduciary duties and award nominal damages" and concluding that "[g]iven that [the plaintiff] failed to prove a causal link between its claimed damages and the proven breaches of fiduciary duty, the Court will issue the declaratory judgment [the plaintiff] has requested and award nominal damages in the amount of \$1.00" (footnotes omitted)); *Ravenswood*, 2018 WL 1410860, at \*19–20 ("At trial, [p]laintiff failed to present any evidence in support of its prayers for relief. . . . As a general matter, I agree with [p]laintiff that compensatory damages are an appropriate means by which to remedy a breach of the duty of loyalty. Plaintiff, however, presented absolutely no evidence upon which the Court could justify an award of compensatory damages to the Company." (footnote omitted)); *Carlson v. Hallinan*, 925 A.2d 506, 540 (Del. Ch. 2006) ("Plaintiffs' claim for breach of fiduciary duties . . . fails, in part, for failure to prove money damages.").

Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails adequately to prove damages.'"[135]

## A.    Count III—$145,037.43

In their briefing, Plaintiffs asked for "rescissory damages in the amount of [Winklevoss Capital's] $1.3 million investment and $897,000 in *pro rata* damages for the established stolen corporate opportunities."[136]  Plaintiffs attribute those totals to Count III for breach of fiduciary duty.[137]  Plaintiffs' request fails on multiple grounds. As I explain below, Plaintiffs ignore Rule 54(c) by requesting damages not set out in the Complaint and fail to identify any legally proper evidentiary basis on which I can award damages for the usurped corporate opportunities.

---

[135] *OptimisCorp v. Waite*, 2015 WL 5147038, at *82 (Del. Ch. Aug. 26, 2015) (rejecting "speculative and unreliable" damages calculation as basis for award following finding of breach of loyalty), *aff'd*, 137 A.3d 970 (Del. 2016); *see also Ravenswood*, 2018 WL 1410860, at *2, *20 n.175 (collecting cases) ("While this court endeavors always to remedy breaches of fiduciary duty, especially breaches of the duty of loyalty, and has broad discretion in fashioning such remedies, it cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking.  Equity is not a license to make stuff up."); Daniel J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, §16.09[c], at 16-128 & n.89 (2022) [hereinafter Wolfe & Pittenger] (explaining that in the breach of the duty of loyalty context where "the Court of Chancery has broad discretion to fashion remedies, damage awards *must always be supported by some level of proof*" and collecting cases (emphasis added)).

[136] Pls.' Br. at 52.

[137] *See id.* at 49–52 (claiming the value of usurpations of corporate opportunities and misappropriations exceed $3.6 million but settling for "rescissory damages in the amount of [Winklevoss Capital's] $1.3 million investment and $897,000 in pro rata damages for the established stolen corporate opportunities.").

24

### 1. Rescissory Damages—$0

Plaintiffs request $1.3 million in "rescissory damages" in their briefing.[138] But neither the operative Complaint nor the original complaint includes a request for rescissory damages.[139] They only request "compensatory damages in appropriate amounts to be determined at trial" and "such other and further relief as the Court deems just and appropriate."[140]

But, having failed to request rescissory damages in their pleadings, I am unable to enter a judgment for rescissory damages. Court of Chancery Rule 54(c) provides that:

> A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.[141]

Put another way, "Rule 54(c) states that a judgment by default is limited to the relief demanded in the complaint."[142] And indeed, "[i]t would be fundamentally

---

[138] *See id.* at 34–38, 52.

[139] Indeed, even the Plaintiffs' motion for default judgment and the briefing filed therewith includes no such mention of rescissory damages.

[140] Am. Compl. at 29; Original Compl. at 14–15.

[141] Ct. Ch. R. 54(c); *see also Steinberg v. Shields*, 152 A.2d 113, 115 (Del. Ch. 1959) ("A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." (quoting Ct. Ch. R. 54(c))); Wright & Miller § 2663 ("A judgment in a default case that awards relief that either is more than or different in kind from that requested originally is null and void and defendant may attack it collaterally in another proceeding.").

[142] Wright & Miller § 2663 (discussing the substantially similar language of Rule 54(c) under the Federal Rules of Civil Procedure and explaining further that "the first sentence of

unfair to have the complaint lead defendant to believe that only a certain type and dimension of relief was being sought[,]" but then, "should defendant attempt to limit the scope and size of the potential judgment by not appearing or otherwise defaulting, allow the court to give a different type of relief or a larger damage award."[143]

Thus, Rule 54(c) serves an important policy role. It finds its roots in a simple truth—default judgments are not inherently bad. In some instances, defaulting can

Rule 54(c) may be thought of as expressing a simple, but important, principle—at any point in a case a defendant is entitled to determine his maximum liability, as fixed by the ad damnum as it stands at that point in the case, and decide whether to proceed further. If defendant chooses not to proceed, liability cannot be increased."). "This principle seems applicable whether or not defendant appears at the damage hearing and therefore should not turn on when the default occurs." *Id.* Indeed, if the first sentence of Rule 54(c) were not to apply to a defendant that appears at the damages hearing, one might justifiably ask whether such treatment would only function to penalize an appearing defendant and whether that result is equitable. *See id.* ("Allowing the ad damnum to be increased might be thought inequitable when defendant merely appears. It is true that defendant will receive notice of the amended pleading and may be treated as acquiescing in the changed prayer for relief if there is no further effort to defend. Arguably, a rule of this type would impose an undue burden on a defendant who really had not intended to defend actively and thus might be viewed as a penalty for making an appearance."); *see also Silge v. Merz*, 510 F.3d 157, 161 (2d Cir. 2007) ("While notice is one of the policy objectives underlying Rule 54(c), notice alone is insufficient to satisfy the rule. The timing and method of such notice (*i.e.*, that it come before the decision to default and be evident from the face of the complaint) are both critical to the analysis.").

Moreover, as some have noted, Rule 54(c) "does not differentiate between a default based on a total failure of defendant to appear and a default following an appearance." Wright & Miller § 2663. But, in other places throughout the rules, the drafters draw distinctions between appearing versus non-appearing defendants against whom default is sought. *See* Ct. Ch. R. 55(b). So "[t]he absence of any words of qualification or differentiation in the first sentence of Rule 54(c) indicates that the provision is intended to apply to all cases of default, whether they involve a party who 'has appeared' or one 'in default for failure to appear.'" Wright & Miller § 2663.

[143] Wright & Miller § 2663; *see also* Steven Baicker-McKee, William M. Janssen & John B. Corr, *Federal Civil Rules Handbook* 1084 (2014) [hereinafter *Federal Civil Rules Handbook*] ("Because a defaulting defendant may be doing so consciously, (*i.e.*, relying on the demand pleaded in the ad damnum clause), a plaintiff may not receive a default judgment for more than the amount sought in the complaint.").

even be the economically rational course of action. If a defendant calculates that his maximum liability for a default judgment is less than what he would owe by litigating through a post-trial judgment, taking into account his own attorneys' fees to get to such a judgment, it may be economically rational for a defendant simply to default (assuming settlement is not a viable option).[144]

As a practical matter, efficient defaults would seem to be in everyone's best interest. The Court does not have to expend its finite and already limited resources on preparing for potentially unnecessary hearings and rulings; the defaulting party limits its exposure to the relief sought in the operative pleading, per Rule 54(c); and the non-defaulting party gets a judgment for the relief it requested in its pleadings.

But these efficiency-enhancing capabilities cannot work if the would-be defaulting defendant could face uncapped liability or if it cannot count on the Court as a check against its opposition's attempts to seek unprecedented judgments for the moon and the stars only after the Court has found it to be in default. Without that check, a party loses the ability to calculate or estimate expected values in any meaningful way.

Rule 54(c) functions by requiring plaintiffs to provide defendants with pre-default notice sufficient to assess the extent of their exposure.[145] But to achieve this,

---

[144]As is the case here, the presence of a prevailing party fee-shifting provision between the litigants would of course affect the parties' respective expected value calculations by raising the relative stakes of winning or losing and of continuing to litigate.

[145] As both sentences of Rule 54(c) make plain, this limit on unpled relief only applies in the default judgment context. The Court is not bound by a complaint's remedial request in a litigated proceeding in which a party has not defaulted. *See* Ct. Ch. R. 54(c).

some degree of specificity is required. Thus, if a complaint's inclusion of a request for "such other and further relief as the Court deems just and appropriate" were sufficient, the first sentence of Rule 54(c) would, in a practical sense, be rendered meaningless.

Accordingly, in the context of a default judgment, federal courts applying the substantially similar language found in Rule 54(c) of the Federal Rules of Civil Procedure have declined to find those general requests sufficient to support a remedy not otherwise specified in the complaint.[146] In one pertinent decision, the United States Court of Appeals for the Second Circuit explained that "[w]hatever its import in other contexts, this formulaic language cannot substitute for the meaningful notice called for by Rule 54(c), which anticipates that defendants will look to the demand clause to understand their exposure in the event of default."[147]

Here, the Complaint only requests compensatory damages, followed by a request for "such other and further relief as the Court deems just and appropriate."[148] Neither provides an adequate basis on which to award rescissory damages—the latter because it fails to provide notice needed to avoid inequitably blindsiding the defaulted

---

[146] *Silge*, 510 F.3d at 160 (rejecting unpled request for prejudgment interest); *see also Federal Civil Rules Handbook* at 1084 ("Courts are also unlikely to construe closing, boilerplate language in a pleading to expand the available remedies in a default situation.").

[147] *Silge*, 510 F.3d at 160; *cf. Hauspie*, 945 A.2d at 587 (discussing "strict conformity with all procedural requirements" governing entry of default judgment).

[148] Original Compl. at 14–15; Am. Compl. at 28.

Defendants and the former because rescissory damages in this context would be "different in kind" from the compensatory damages requested in the pleadings.[149]

## 2. Compensatory Damages—$145,037.43

"The traditional measure of damages is that which is utilized in connection with an award of compensatory damages, whose purpose is to compensate a plaintiff for its proven, actual loss caused by the defendant's wrongful conduct."[150] Thus, "compensatory damages are measured by the plaintiff's 'out-of-pocket' actual loss."[151]

As noted, the plaintiff bears the burden of proving damages by a preponderance of the evidence. Here, Plaintiffs seek "*pro rata* damages for stolen corporate opportunities[,]"[152] to which they do not show an entitlement. Plaintiffs do,

[149] *See Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *8 (Del. Super. Apr. 7, 2020) ("Rescissory damages are an exception to the normal out-of-pocket measure of compensatory damages . . . ." (quoting *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000))); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *49 (Del. Ch. July 6, 2018) (describing how "[r]escissory damages differ from compensatory damages"), *aff'd*, 221 A.3d 100 (Del. 2019); *Creative Rsch. Mfg. v. Advanced Bio-Delivery LLC*, 2007 WL 286735, at *10 (Del. Ch. Jan. 30, 2007) (distinguishing between "a breach of contract measure of damages[,]" compensating plaintiffs for unpaid balances, and "rescissory damages" for plaintiffs' operating costs and expenses); *Universal Enter. Gp., L.P. v. Duncan Petroleum Corp.*, 2013 WL 3353743, at *16 (Del. Ch. July 1, 2013) ("[R]escissory damages may be significantly higher than the conventional out-of-pocket damages, because rescissory damages could include post-transaction incremental value elements that would not be captured in an 'out-of-pocket' recovery." (quoting *Strassburger*, 752 A.2d at 579)).

[150] *Strassburger*, 752 A.2d at 579; *see also Jardel Co. v. Hughes*, 523 A.2d 518, 528 (Del. 1987) ("The object and purpose of an award of compensatory damages in a civil case is to impose satisfaction for an injury done. In tort actions that satisfaction normally takes the form of an award of monetary damages to an injured plaintiff, with the size of the award directly related to the harm caused by the defendant. Once liability is established, the goal in fixing damages is just and full compensation, with the focus upon the plaintiff's injury or loss.").

[151] *Strassburger*, 752 A.2d at 579.

[152] Pls.' Br. at 41. I treat this as a request for compensatory damages.

however, show they are entitled to their pro rata share of funds Shaw misappropriated. I address these issues in turn.[153]

### a. Corporate Opportunities—$0

"The corporate opportunity doctrine is a consequence of a fiduciary's duty of loyalty, and it exists to prevent officers or directors of a corporation—or, as in this case, a managing member of an LLC—from personally benefiting from opportunities belonging to the corporation."[154] It provides that:

> a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate

---

[153] As an aside, I recognize that the claims here are likely derivative, but that determination would not affect the remedy in this case. Our law recognizes that an investor-level pro rata recovery can be awarded when "defendants are insiders who misappropriated corporate property such that an entity-level recovery would return the property to the wrongdoers' control" or when "an entity-level recovery would benefit 'guilty' stockholders, but an investor-level recovery could be more narrowly tailored to benefit only 'innocent' stockholders." *Goldstein v. Denner*, 2022 WL 1797224, at *17 (Del. Ch. June 2, 2022); *see also id.* at *17 nn. 16–18; *Deane v. Maginn*, 2022 WL 16557974, at *30–31 (Del. Ch. Nov. 1, 2022), *appeal dismissed*, 291 A.3d 651 (Del. 2023) (granting a pro rata recovery to prohibit the defendant-manager of the betrayed investment vehicle from profiting off his disloyalty and to avoid the risk of additional disloyalty). This case fits the mold. Furthermore, factors that counsel against a pro rata recovery are absent from this case. Although one factor that weighs against a direct recovery is the risk of limiting the assets available an entity's creditors, here that concern is absent as Shaw appears to be Treats' only significant creditor. And while another factor that weighs against a pro rata recovery is the risk of bypassing innocent stockholders in a going concern, Shaw (through the Trust) is the only other unitholder. Finally, the entity is hardly a going concern. The company was basically a one man show and Shaw has left the stage. There are no records of Treats operating after 2017. Accordingly, to the extent Plaintiffs show Treats is entitled to damages flowing from Shaw's breaches of fiduciary duty, they are entitled, in these unusual circumstances, to a pro rata portion of those damages.

[154] *Grove v. Brown*, 2013 WL 4041495, at *8 (Del. Ch. Aug. 8, 2013).

30

fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[155]

Here, the facts deemed admitted make clear that Shaw owed fiduciary duties and usurped a series of opportunities that should have gone to Treats. Plaintiffs tell me that, combined, the value of the corporate opportunities arising from the 2015 Oscars Party, Treats Calendar Documentary, Screen Vision Sponsorship, 2017 Oscars Party, 2020–2022 Wires, Treats Summer House, and Circus/Treats Deal total $2,346,000.[156] Plaintiffs calculate this sum using only the gross revenues Shaw or one of his other entities received.[157] But, critically, "[t]he usual remedy for usurpation of corporate opportunity is calculated based on the *lost profits* that were diverted to the other business or by the *profits* generated by the other business that otherwise would have flowed to the company."[158] Here, any cost to Treats comes in the form of

---

[155] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996).

[156] Pls.' Br. at 39. Plaintiffs' pro rata portion (38.24%) of $2,346,000 is $897,110.40.

[157] *See, e.g.*, *id.* at 50 ("Shaw received *over* $2.3 million in *revenue*" (second emphasis added)).

[158] *Utilisave, LLC v. Khenin*, 2015 WL 4931862, at *7 (Del. Ch. Aug. 18, 2015) (emphases added); *see also In re Mobilactive Media, LLC*, 2013 WL 297950, at *1 (Del. Ch. Jan. 25, 2013) ("I grant monetary relief in the form of damages based on the profits the defendants unjustifiably received from their participation in opportunities that should have been, but were not, presented to the joint venture."); *Dweck v. Nasser*, 2012 WL 161590, at *17 (Del. Ch. Jan. 18, 2012) ("As damages for usurping Kids' corporate opportunities, Dweck, Taxin, Success, and Premium are jointly and severally liable to Kids for the lost profits Kids would have generated from business diverted to Success and Premium."); *TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc.*, 2000 WL 1478537, at *2 (Del. Ch. Oct. 2, 2000) (explaining on motion to expedite that "[c]ompensatory damages are sometimes a sufficient and complete remedy in cases where a fiduciary has manipulated corporate machinery to benefit itself by expropriating a corporate opportunity. When a minority shareholder can prove, for example, that a fiduciary has *profited* by accepting certain payments in connection with a transaction, those payments may form the basis for a damage award incidental to the breach of duty." (emphasis added)).

31

lost profits. Had Shaw offered these opportunities to Treats, Treats could have only benefited from them to the extent the cost of undertaking would be less than the gross revenue it would have received.

In the corporate opportunity context, Delaware courts have determined lost profits using a variety of methods. Among other ways, a plaintiff can establish lost profits through expert testimony.[159] Or the court can use a layman's estimate.[160] "[T]he Court may exercise its 'own independent judgment in determining the calculation of damages[,]'" but some evidence quantifying lost profits remains essential to exercising that judgment.[161]

Here, Plaintiffs only identify *gross revenue* from the usurped opportunities. With limited exceptions, this leaves me without a basis for determining lost profits. "Equity is not a license to make stuff up."[162] I do, however, consider each opportunity individually to demonstrate why a lost profits calculation is not possible.

---

[159] *See Beard Rsch., Inc.*, 8 A.3d at 618 (touching on how plaintiff's damages expert calculated lost profits); *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) (granting an award of defendant's profits as an estimate of plaintiff's profits), *aff'd*, 988 A.2d 938 (Del. 2010).

[160] *See Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *26–27 (Del. Ch. Aug. 18, 2016) (analyzing corporate officer's estimate of lost profits).

[161] *See id.* at *28 (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24); *OptimisCorp*, 2015 WL 5147038, at *82 (rejecting "speculative and unreliable" damages calculation as basis for award following finding of breach of loyalty); *see also Ravenswood*, 2018 WL 1410860, at *20 & n.17 (same, collecting cases); Wolfe & Pittenger §1609[c], at 16-128 (explaining that in the breach of the duty of loyalty context where "the Court of Chancery has broad discretion to fashion remedies," a compensatory "damage awards *must always be supported by some level of proof*" (emphasis added)).

[162] *Ravenswood*, 2018 WL 1410860 at *2.

- **The 2015 Oscars Party—$0:** Plaintiffs identify three "[d]eposits" to Circus totaling $150,000, which they assert were "sponsorship income" related to the 2015 Oscars Party.[163] Plaintiffs seek the entire $150,000 in gross revenue.[164]

- **The Treats Calendar Documentary—$0:** Plaintiffs identify five "[d]eposits" made to ShawCo that total $556,000, which, they assert, were made in conjunction with the Treats Calendar Documentary.[165] That is a gross revenue figure.

- **Screen Vision Sponsorship—$0:** Plaintiffs identify a single $100,000 payment to Circus in conjunction with the "lunch & Rosé" event.[166] Again, that is a gross revenue figure.

- **The 2017 Oscars Party—$0:** Plaintiffs identify a singular payment of $75,000 from "Screevision" to ShawCo.[167] As with the others, Plaintiffs do not provide any assessment of costs associated with hosting the 2017 Oscars Party. That is a gross revenue figure.

- **The 2021 Wires—$0:** Plaintiffs identify "deposits" from Synapse Financial Technologies to ShawCo, totaling $195,000.[168] They even describe the $195,000 as "revenue[,]" *not* profits.[169]

---

[163] *See* Dkt. 291, Demonstrative Exs. A–I to Pls.' Pre-Evidentiary Hr'g Br. ("Demonstrative") Ex. B; Pls.' Br. at 10; PX-60.

[164] Plaintiffs did not raise the 2015 Oscars Party or the 2021–2022 Wires in the Complaint. Since one purpose of a Rule 55(b) hearing is to quantify the damages arising from the facts set forth in the complaint, I am hesitant to consider these opportunities. The policy reasons barring remedies different than those requested in the pleadings would seem to apply in equal measure to a new, unpled bases for damages. *See* Wright & Miller § 2663 (explaining that under Rule 54(c), "a default judgment may not extend to matters outside the issues raised by the pleadings or beyond the scope of the relief demanded").

[165] *See* Demonstrative Ex. C.

[166] *See* Pls.' Br. at 19.

[167] *See* PX-81; Pls.' Br. at 18.

[168] *See* Pls.' Br. at 23; Demonstrative Ex. E.

[169] *See* Pls.' Br. at 23. As an initial matter, even accepting the facts alleged in the Complaint as admitted, I question whether Plaintiffs show the 2021 Wires payments were made in conjunction with a valid corporate opportunity in which Treats had an interest or expectancy. Plaintiffs' logic is as follows: (1) the payments were made to ShawCo, (2) "ShawCo is a competing enterprise to Treats," so (3) "this $195,000 revenue from the 2021

- **The 2022 Wires—$0:** Plaintiffs identify two payments totaling $60,000 from Rpz La LLC to ShawCo for a Super Bowl party.[170] Those are revenues, not lost profits.

Plaintiffs failed to carry their burden of proving damages for these opportunities.[171]

The Treats Summer House and Circus/Treats Deal are different and require further explanation.[172]

### i.    The Treats Summer House—$0

Shaw (through ShawCo) organized and hosted events at a rental house in Malibu known as the Treats Summer House. A ShawCo pitch deck linked these events to Treats and refers to them as Treats' events.[173]

In connection with these events, Plaintiffs identify two payments to Steve Shaw Photography, Inc. totaling $170,000.[174] One of Plaintiffs' exhibits, however,

---

Wires to ShawCo was another diverted opportunity from Treats." *Id.* But the mere fact that ShawCo received "revenue" from a third party does not automatically mean it was a corporate opportunity in which Treats had an interest or expectancy. This question, however, is of little ultimate consequence because, even if a corporate opportunity, Plaintiffs fail to carry their burden of proving damages.

[170] *See id.*; Demonstrative Ex. I.

[171] *Cf. Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 & n.84 (Del. Ch. Oct. 23, 2002) (rejecting plaintiff's request for revenues as remedy for unjust enrichment arising from breach of non-compete agreement and explaining that the "[d]efendants were not enriched" by the amount of revenues and instead "[t]he [d]efendants' profits, not their revenues, are the correct measure of their unjust enrichment and of [the plaintiff's] damages[,]" but noting that the plaintiff "made no effort to prove the profits which it would have realized from the business which Defendants obtained in violation of the [a]greement").

[172] I address the 2020 Wires below under misappropriation, instead of as a corporate opportunity.

[173] *See* PX-68.

[174] *See* Demonstrative Ex. D; PX-73.

34

does include an itemized list of expenses that Shaw compiled in connection with these events.[175]  Despite citing the exhibit in which the list is found, Plaintiffs make no further mention of it.[176]  Yet, Shaw's list shows the expenses exceed the amount of the deposits.

It includes the following:[177]

| Item | Cost |
|---|---|
| Photography | $10,000 |
| Video | $15,000 |
| Salt of Earth Book | $35,000 |
| PR & Media | $15,000 |
| ShawCo Production Fee | $75,000 |
| Guest List/Invites | $20,000 |
| ShawCo Staff | $10,000 |
| Payment to Broker for Rental of Malibu House | $70,000 |
| **Total** | **$250,000** |

It seems the only evidence in the record shows the expenses exceeded the revenues by a significant amount.  One might question the accuracy of these expenses, but even if I factored in a discount or quibbled with various line items, it would still be difficult to find damages for Plaintiffs.  And any attempt to do so would be only "the product of rank speculation and, as a matter of law, improper."[178]

---

[175] PX-71.

[176] *See* Pls.' Br. at 17 nn.81–82.

[177] *See* PX-71.

[178] *Ravenswood*, 2018 WL 1410860, at *20.

## ii.     The Circus/Treats Deal—$0

Plaintiffs identify three "[d]eposits" to Circus totaling $625,000, which they claim related to the Circus/Treats Deal.[179]   Plaintiffs also identify two other "[d]eposits" totaling $375,000, which Plaintiffs suggest are "likely" related to the same Circus/Treats Deal.[180]

The first two deposits were each for $250,000[181] and correspond to the two loan tranches of "convertible loan notes" in a signed term sheet between Circus and Great Fortune.[182] The term sheet also contemplates that the payments were part of a larger transaction with Great Fortune.[183] The other deposits, totaling $500,000, also appear to be funds Great Fortune loaned Circus.[184] Plaintiffs treat the top-line figures as the value of the opportunity. But the foregone benefit is the value of the opportunity to borrow. In this case, the value of the opportunity was not necessarily the $1,000,000 (as Plaintiffs suggest), nor was it the $625,000. It was the value of the opportunity to borrow those amounts. But Plaintiffs provide me *no* evidentiary basis on which to estimate that value.

---

[179] *See* Demonstrative Ex. A.

[180] *See id.*

[181] *See id.*; PX-60.

[182] *See* PX-45.

[183] *Id.*

[184] A third deposit for $125,000 reflects  more funds from Great Fortune loaned Circus. *See* PX-53.  It is not clear what agreement it relates to.  *See id.*; PX-45.

By way of example, one might expect a term sheet like the one here to identify an interest rate from which some general value of the arrangement might be extrapolated. But here, the term sheet does not identify any specific interest rate that would govern repayment.[185] It seems that instead of making a direct, economic return on its investment through interest payments, Great Fortune expected to receive specific promotional services in return. In addition to a "Brand Collaboration" section, the term sheet also explains that Circus "will run a minimum of one editorial page promoting [a Great Fortune subsidiary brand] as [its] interactive mobile partner" and Circus "will provide a minimum of two advertising pages per edition which can be used by [lender] at its discretion."[186]

Since Plaintiffs leave me with no basis on which to value the services exchanged under this sort of arrangement, I cannot determine the value of what Circus gave up in exchange for the benefit of the liquidity provided under the agreements.

* * *

As the foregoing makes plain, Plaintiffs are not entitled to any compensatory damages arising from the corporate opportunities. It is not for lack of trying that I

---

[185] *See* PX-45. Under the section titled "Interest" it instead provides that "[n]o interest will accrue on the Loan, save as set out below." *Id.* Following the "Interest" section, the only place *any* interest rate is identified is pursuant to an acceleration provision that can be triggered if there is an event of default. *Id.*

[186] *Id.* The other lending documents that make up the other parts of the Circus/Treats Deal provide similarly. Under on such loan agreement, the section titled "INTEREST" only provides that "interest on the unpaid amount shall accrue" if Circus "fails to make any payment due[.]" PX-53.

arrive at this conclusion. I have attempted to piece together *any* reasonable basis on which to calculate the costs associated with the corporate opportunities and award lost profits. Indeed, my law clerks and I spent a great deal of our already scarce time[187] combing the record for anything that might provide a reasonable basis for compensatory damages for these opportunities. But the truth is that many (if not all) of the opportunities Shaw took could have produced net losses.

As it relates to Plaintiffs' failure to meet their burden, I pause here to clarify an important point. This decision should not be read to expand meaningfully the type of showing needed to support a claim for damages. And it certainly should not be read to do so in the default judgment context. It should only be read to hold plaintiffs accountable when they try to take advantage of seemingly absent, unrepresented defendants by asking for unprecedented and unsupported damages awards or by seeking relief they failed to request in their pleadings.

The burden to show damages is not onerous—especially, as here, where a party seeks damages arising from proven breaches of the duty of loyalty. But although not onerous, that burden exists. And if it exists, it must require more than the complete absence of any showing or attempted showing of damages or failure to provide the Court with any basis (reasonable or unreasonable) on which it can estimate damages.

Moreover, the facts and circumstances here are somewhat unusual. Here, unlike in many default judgment actions, the litigation progressed considerably by

---

[187] For those who are curious, my law clerks estimate that by the time they complete their respective clerkships this month, they will have each worked at least 3,900 productive hours (if not more) since August 2023.

the time of default; Plaintiffs amended their complaint shortly before seeking default judgment; there was meaningful discovery (which Plaintiffs reference repeatedly in the Complaint[188]); and Plaintiffs had copies of invoices, general ledgers, profit and loss statements, balance sheets, and other financial documents compiled by Shaw's accountants for most (if not all) of the relevant entities. Plaintiffs also deposed Shaw's accountants and various other individuals involved in Shaw's schemes and even hired an expert witness who, as I discuss below, was able to trace payments across the various accounts at issue.

Put another way, this is not a case where it seems Plaintiffs lacked sufficient evidence. If Plaintiffs lacked sufficient evidence and had made some effort to explain why they are unable to provide a reasonable evidentiary basis on which to calculate the profits flowing from the opportunities—something to which their expert could have undoubtedly attested if it were the case—I would have been sympathetic to such a showing. And indeed, this might often be the case in default judgment actions where a party defaults by failing to appear.

But this is not such a case. Here, Plaintiffs did not even try to show the insufficiency of available evidence as to these corporate opportunities.[189] Instead,

---

[188] *See* Am. Compl. ¶¶ 1, 36, 39, 41, 42, 63.

[189] *Cf. Barbey v. Cerego, Inc.*, 2023 WL 6366055, at *8 (Del. Ch. Sept. 29, 2023) ("[T]he production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 878 (Del. 1985))), *aff'd*, 2024 WL 2954223 (Del. June 11, 2024); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 46 (Del. Ch. 2013) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1119 n.7 (Del.1994)).

39

they put forward arguments and calculations that are inconsistent with our law. Compounding these problems, Plaintiffs seem to ignore Rule 54(c) and, in doing so, would seem poised to blindside unrepresented defendants with damages that are different from those requested in the Complaint's prayer for relief. Plaintiffs undermined the efficiency-enhancing capabilities of the default-judgment mechanism in a manner that required the Court to expend a great deal of resources checking counsel's work, and, in some instances, doing counsel's work for them.

A plaintiff's belief that it lacks a meaningful obligation to color within the lines in its submissions to a court can give rise to a host of moral hazard problems. A plaintiff might feel a sense of assurance at the default judgment stage. Without opposition to its request for damages, the plaintiff may be tempted to ask the court to enter judgments for extreme or unprecedented damage awards to which it is not entitled, believing there will be no repercussions for doing so.

To the extent such tactics are intentional and are not simply a product of counsel's insufficient diligence, it would seem that in such a plaintiff's best-case scenario the novel or errant nature of its request will go unnoticed by the court, which will likely enter judgment for the damages requested even though it may be for an amount exceeding the damages to which the plaintiff is actually entitled. And in the worst-case scenario, the court catches the plaintiff's attempt to take a larger slice of pie than it is owed and only awards it the damages to which it is entitled.

On a rudimentary level, this suggests the expected value of seeking an unjustified judgment may, at times, exceed the expected value of asking for that to

which one actually is entitled. But such an approach is not without costly externalities.

### b. Misappropriated Funds—$145,037.43

"If corporate fiduciaries divert corporate assets to themselves for non-corporate purposes, they are liable for the amounts wrongfully diverted."[190] But there must be some evidence to support the amounts sought.[191] Here, Plaintiffs' expert witness, forensic accountant David Hanson, testified that by June 2013—10 months after Winklevoss Capital's Investment in Treats—Shaw had used all the Investment.[192] Of the $1.3 million, Hanson testified that Shaw expended approximately $339,000 "in areas that were unrelated to the Treats[] operation."[193] His report puts the figure at $339,282.[194]

Hanson's calculations, report, and testimony were credible. Based on his testimony, Plaintiffs proved by a preponderance of the evidence that Shaw misappropriated these funds. Among other things, the record shows Shaw used the

---

[190] *Dweck*, 2012 WL 161590, at *19 (quoting *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *45 (Del. Ch. May 31, 2000)).

[191] *Bamford v. Penfold, L.P.*, 2022 WL 2278867, at *53 (Del. Ch. June 24, 2022) (declining to award damages for expenses that plaintiffs' expert "didn't feel like he had sufficient information to opine definitively about" after plaintiffs obtained records from defendants' auditors and accountants), *aff'd*, 2024 WL 1716494 (Del. Apr. 22, 2024).

[192] *See* Tr. at 174, 176.

[193] *See id.* at 185.

[194] *See* PX-125.

Investment to pay a mortgage on one personal residence, rent on another personal residence, a lease on a Range Rover, and photoshoots for third parties.[195]

As for the 2020 Wires, Plaintiffs suggest the three payments totaling $40,000 relate to Shaw setting up Treats UK and the UK trademarks.[196] The wires were sent less than a month after Shaw incorporated Treats UK and registered the UK trademarks.[197] Although the memo lines for the wires reference the repayment of a loan,[198] I find that purpose unlikely. There does not appear to be anything to corroborate a loan from ShawCo to Treats. This is another example of Shaw misappropriating Treats' funds.[199]

Thus, under Count III, Shaw is liable to Plaintiffs for their pro rata share of these misappropriated amounts, or $145,037.43.

## B. Counts I & II—$25,052.83

Counts I and II are for breach of contract. In Count I, Plaintiffs claim Shaw, Treats, and the Trust breached the LLC Agreement and Purchase Agreement in a host of ways. "The fundamental principle that underlies the availability of contract damages is that of compensation."[200]

---

[195] *See id.* Ex. D.

[196] Pls.' Br. at 21–22.

[197] *Compare* PX-131, *and* PX-122, *with* PX-102, PX-103, *and* PX-104.

[198] *See* PX-102; PX-103; PX-104.

[199] Shaw's use of trademarks is addressed further below.

[200] 24 Williston on Contracts § 64:1 (4th ed.), Westlaw (database updated May 2024); *see also Ramjet Aviation, Inc. v. My Parts Locator, Inc.*, 2023 WL 166009, at *8 (N.D. Ohio

[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante.* This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost. . . . [E]xpectation damages must be proven with reasonable certainty, and "no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative."[201]

---

Jan. 12, 2023) ("Compensatory damages, often called expectation damages, seek to place the injured party in the same position it would have been in but for the breach."); Marco J. Jimenez, *Retribution in Contract Law*, 52 U.C. Davis L. Rev. 637, 659 (2018) (referring to expectation damages as a "form of" compensatory damages); Daniel B. Kelly, *On Disgorgement and Punitive Damages in Trust Law*, 107 Iowa L. Rev. 2079, 2124 (2022) (same). The Complaint does not include an express request for expectation damages. So it seems relevant to note that I need not rely on the remedies for Counts I and II being for expectation damages. I do not find it appropriate to award damages under Count I since, among other things, Plaintiffs do not ask for (or show) recoverable damages in conjunction therewith. As for Count II, although the Complaint does not state the specific type of damages Plaintiffs seeks as to the 2012 Promissory Note, it expressly states the extent of the damages Plaintiffs seek to recover. Am. Compl. ¶ 74 ("[Winklevoss Capital] has been damaged in the amount of $20,000.00 plus interest of 2% per annum since inception of the note: October 26, 2012, for Defendants' failure to repay the principal with interest."). This provided Defendants with a clear basis on which to calculate damages sought pursuant to Count II and thus it provides sufficient information to assess easily the extent of Defendants' exposure when deciding whether to default. Put another way, Plaintiffs provided the meaningful notice required by Rule 54(c) as to Count II and they do not request recoverable damages as to Count I, so this part of my analysis does not turn on whether it is necessary to award expectation damages.

[201] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130–31 (Del. 2015) (footnote omitted); *see also Dill*, 2016 WL 4127455, at *1 ("[T]he standard remedy, or damages, for a breach of contract is based upon the reasonable expectations of the parties, in an amount that is equal to the loss in value of defendant's nonperformance, or breach. Damages for a breach of contract must be proven with reasonable certainty.").

Unfortunately for Plaintiffs, they fail to tie *any* of these breaches to the fact of damage,[202] the amount of damage,[203] or the damages arise from Shaw's misappropriation of funds, which is addressed above.[204] Plaintiffs do not even ask for

[202] For example, Plaintiffs assert that Shaw loaded Treats with over $250,000 of debt without Winklevoss Capital's approval, in violation of the LLC Agreement's prohibition on such conduct. Pls.' Br. at 44–45. But, based on Plaintiffs' briefing and presentation, I cannot evaluate damages for the debt incurred. Indeed, here it is not even clear that Plaintiffs have shown a tangible harm associated with that debt. Plaintiffs also assert Shaw "warranted an increase in common units to secure at least one related loan" in violation of the prohibition on "increas[ing] or decreas[ing] the number of authorized units of any class or series of units." *Id.* Plaintiffs contend that Shaw "granted the lender a warrant to purchase 34,257 common units of Treats[.]" *Id.* Plaintiffs do not (1) indicate whether the warrant was ever exercised, (2) provide any formula for calculating the damages from the warrant, or (3) assign any dollar amount in (or provide the Court with a methodology for calculating) damages.

[203] For example, Plaintiffs note that, with respect to the "t!" and "treats!" trademarks, Shaw failed to cause the Trust to assign them to Treats (PX-63), in violation of the terms in the Purchase Agreement, and instead "cancel[]ed them altogether in 2018 after this litigation commenced, and then re-registered Treats! Trademarks under his new competing enterprises." *See* Pls.' Br. at 43–44. Plaintiffs connect this breach to Shaw's "us[e of] the *Treats!* [Magazine] website to divert business to his competing enterprise, Treats UK." *Id.* at 44. But Plaintiffs do not assign any dollar amount to this conduct. Nor do Plaintiffs offer a method for determining or even estimating the damages. Plaintiffs claim that "Shaw misappropriated the Treats[] Trademarks, diverted them to other entities under his control, and used the stolen intellectual property in manners against [Winklevoss Capital's] interests" in violation of the prohibition on "tak[ing] any action in contravention of the Purchase Agreement." *Id.* at 48. Again, Plaintiffs assign no dollar amount to the conduct and provide me no methodology for reaching a damages figure. The same goes for any breaches of Section 3.03(j) of the LLC Agreement. Plaintiffs also assert that Shaw's violation of the LLC Agreement's requirement to separately conduct Treats' business and operations resulted in the "Circus/Treats Deal, the Calendar Documentary Project, NuMuses, Treats! Summer House, Treats! 2017 Oscars Party, Screen Vision Sponsorship, and 2020-2022 Wires." *Id.* at 42. By and large, these are the same revenues referenced in support of Shaw's breaches of fiduciary duty under Count III. *See id.* at 39 ("Defendants stole at least $2,346,000 in corporate opportunities from Treats related to the Calendar Documentary Project, Circus/Treats Deal, Treats! 2015 Oscars Party, 2016 Treats! Summer House, Treats! 2017 Oscars Party, Screen Vision Scholarship and 2020-2022 wires."). The only late comer is the reference to NuMuses, which Plaintiffs go on to explain are among those "incapable of exact quantification" and thus provide the Court no basis on which to estimate damages. *See id.* at 50–51.

[204] For example, Plaintiffs indicate that Shaw violated the LLC Agreement's prohibitions on commingling funds which was designed to prevent "Shaw [from]

44

compensatory damages arising from the breaches.[205] They only request the rescissory damages and pro rata damages from the corporate opportunities. Plaintiffs therefore did not meet their burden of showing the amount of damages.

Count II is a different story. Under the 2012 Promissory Note, Treats owed $20,000 in principal plus interest accruing at 2% per annum. When Treats took on this obligation, the parties expected Treats to perform. But it did not. Plaintiffs now seek damages for Treats' breach of the 2012 Promissory Note and prejudgment interest at the contract rate. As of the Rule 55(b) hearing, Plaintiffs assert this amount totals $25,052.83. They proved their entitlement to that amount so judgment will be entered against Treats for that sum.

---

misappropriating funds for himself or other businesses." *See id.* at 41–42. Plaintiffs suggest that following the Investment, Shaw's expenditures for "Meals and Entertainment" sky-rocketed to over "five times" his prior spending—$62,169.38. *See* Pls.' Br. at 43 & n.154 (noting that this figure includes expenditures incurred on "the Treats! AmEx" and the "American Express cards"). But, to the extent any damages can be awarded for this sum, it would be duplicative of Hanson's estimates of misappropriated funds that I addressed under Count III. *Compare id.*, *with id.* at 31–32 (citing the "'Meals and Entertainment' credit card charges" on the "Treats! AmEx"), *and* PX-125.

[205] With the exception of a single sentence, Plaintiffs do not even suggest that they seek any recovery for the breaches of contract. That sentence is the first sentence of Plaintiffs' legal analysis, in which they state that "Defendants, through numerous self-interested breaches of fiduciary duty and contractual breaches of the Purchase Agreement, have rendered Treats valueless." Pls.' Br. at 29. And as to that lone sentence, Plaintiffs hint that the breaches of contract, which contribute to "render[ing] Treats valueless," functions as the basis for awarding rescissory damages. But for the reasons discussed above, I am unable to award rescissory damages. *See also* Ct. Ch. R. 54(c). Moreover, they repeat the substance of this sentence later in the brief, leaving out any reference to the breaches of contract. *See* Pls.' Br. at 38 ("Shaw and the Trust, through self-interested breaches of fiduciary duty, have rendered Treats valueless and cost [Winklevoss Capital] its entire $1.3 million [I]nvestment.").

45

## C.     Count IV

The last claim seeks a declaratory judgment that Plaintiffs bear no contractual obligation to market or promote Treats or any of its publications and Defendants have no valid claims against them in this regard.  Plaintiffs are entitled to this declaration based on the well-pled, admitted facts in the Complaint.

## D.     Attorneys' Fees—$1,250,000

"Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees."[206]  But this rule is not without exception.  "For one, '[a] fee-shifting provision in an enforceable contract provides a clear exception to the default American Rule.'  An applicable provision allows 'a trial judge [to] award the prevailing party all the costs it incurred during litigation.'"[207]

Plaintiffs invoke this exception by requesting attorneys' fees under the fee-shifting provision in the LLC Agreement.[208]  The operative question under that provision is whether Plaintiffs can properly be considered the "prevailing party."

---

[206] *Avgiris Bros., LLC v. Bouikidis*, 2023 WL 7137104, at *2 (Del. Ch. Oct. 31, 2023) (quoting *Beck v. Atlantic Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005)).

[207] *Id.* (quoting *Manti Hldgs, LLC v. Authentix Acq. Co., Inc.*, 2020 WL 4596838, at *4 (Del. Ch. Aug. 11, 2020) and *Sternberg v. Nanticoke Mem'l Hosp., Inc.*, 62 A.3d 1212, 1218 (Del. 2013)).

[208] PX-11 (Section 15.15 of the LLC Agreement provides that: "In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs."). *See generally Leistner v. Red Mud Enter. LLC*, 2023 WL 11196881 (Del. Ch. Apr. 26,

"Delaware law is clear that in the usual case, and absent contractual language to the contrary, whether a party has prevailed is determined by looking at the outcome of the substantive issues, not damages."[209] Thus, even in instances where this Court has awarded nominal damages, it has still found occasion to shift fees where a plaintiff predominated in the substance of the litigation.[210]

Plaintiffs are the prevailing parties. They sought and obtained a default judgment and showed Defendants breached fiduciary and contractual obligations. There is no question that Plaintiffs predominated in the substance of this litigation.

"Unless otherwise stated in the contract, 'a contractual provision entitling the prevailing party to fees will usually be applied in an all-or-nothing manner."[211]

---

2024) (awarding fees under LLC agreement's fee-shifting provision where the language in the provision was identical to that in the LLC Agreement at issue here); *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012 (Del. Ch. May 13, 2013) (then-Chancellor Strine, shifting fees under provision in LLC agreement); *Avgiris*, 2023 WL 7137104, at *3 n.30 (collecting cases and explaining that "the Court of Chancery has previously awarded fees in Section 18-110 actions under prevailing party provisions in LLC agreements"). Plaintiffs also seek fee-shifting under similar provisions in the Purchase Agreement and the 2012 Promissory Note. Since I find fee-shifting appropriate under the LLC Agreement, I need not reach a conclusion on whether it would be proper under these other agreements.

[209] *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *14 (Del. Ch. Apr. 27, 2009); *Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *2 (Del. Ch. Apr. 27, 2004) (explaining that prevailing party is the party that "predomina[tes] in the litigation").

[210] *See Ivize*, 2009 WL 1111179, at *14 (finding that although the plaintiff "did not prove its damages with the required certainty, it did" prove breach of contract and so it prevailed in the substance of the litigation).

[211] *Id.* (footnote omitted) (awarding attorneys' fees under prevailing party provision in action in which it awarded plaintiff nominal damages).

47

Accordingly, Plaintiffs are entitled to the full amount requested: $1,250,000.[212]

Defendants are jointly and severally liable.[213]

**E.     Interest**

Turning to interest, Plaintiffs' Complaint also does not include an express request for post-judgment interest. An award of such interest is, however, permitted in the default context notwithstanding the first sentence of Rule 54(c). In particular, federal courts have interpreted the substantially similar language of Rule 54(c) of the Federal Rules of Civil Procedure as not barring post-judgment interest when an award of post-judgment interest is not left to the trial judge's discretion.[214]

Here, Plaintiffs' failure to request post-judgment interest in the Complaint is not fatal since an award of post-judgment interest in Delaware "is a right belonging to the prevailing plaintiff and is not dependent upon the trial court's discretion."[215] Accordingly, Plaintiffs are "entitled to post-judgment interest at the legal rate from

---

[212] *See* Pls.' Br. at 59 ("Plaintiffs are entitled to the $1,250,000 in attorneys' fees and costs as requested in the accompanying Affidavits."); *see also* Dkt. 291, Rule 88 Aff. Charles J. Harder ("Harder Aff.") ¶ 12 ("[P]laintiffs respectfully request an award of $1,250,000 for work performed by both Harder Stonerock and Morris James in connection with the Action. Across both firms, that is taking into account a voluntary discount of more than 53%."). This $1,250,000 is inclusive of the fees and expenses I awarded to Stonerock Harder LLP in conjunction with Plaintiffs' successful motion to compel. *See* Harder Aff. ¶ 7. To the extent this figure does not include the $5,457.15 in fees and costs Morris James LLP is entitled to pursuant to my order to that effect, that amount is so added to the award of $1,250,000.

[213] *See* 6 *Del. C.* § 18-101(9); *see also 2009 Caiola Fam. Tr. v. PWA, LLC*, 2015 WL 6007596, at *33 (Del. Ch. Oct. 14, 2015) (holding the defendants "jointly and severally liable" for the plaintiffs' attorneys' fees under fee-shifting provision in LLC agreement).

[214] *See ExxonMobil Oil Corp. v. Black Stone Petroleum Inc.*, 221 F. Supp. 3d 755, 769 (E.D. Va. 2016) (sustaining objection to magistrate judge's refusal to award post-judgment interest where it was not a matter of judicial discretion).

[215] *Wilmington Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000).

the date of judgment, compounded quarterly" for damages arising from Count III for breach of fiduciary duty and for attorneys' fees.[216] As to Count II for breach of the 2012 Promissory Note, Plaintiffs are entitled to post-judgment interest at the lesser of the legal rate and contract rate.[217]

But Plaintiffs are not entitled to prejudgment interest, except as to the damages arising from Count II for which they identified the amount of their damage as including prejudgment interest.[218] Only in a footnote to their brief do Plaintiffs claim they should receive prejudgment interest on other damages if the Court does "not grant Plaintiffs' request for rescissory damages to [Winklevoss Capital] in the amount of its $1.3 million investment."[219]

---

[216] *Polychain Cap. LP v. Pantera Venture Fund II LP*, 2022 WL 2467778, at *12 (Del. Ch. July 6, 2022).

[217] *See* 6 *Del. C.* § 2301(a) ("Except as otherwise provided in this Code, any judgment entered on agreements governed by this subsection, whether the contract rate is expressed or not, shall, from the date of the judgment, bear post-judgment interest of 5% over the Federal Reserve discount rate including any surcharge thereon or the contract rate, whichever is less."); *see also Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.,* 269 A.3d 974, 976, 980–82 (Del. 2021) (quoting final sentence of 6 *Del. C.* § 2301(a) and explaining that post-judgment interest accrues at the legal rate "[i]n contract cases where the parties have not agreed to an interest rate" and quoting legislative history to 2012 amendment to 6 *Del. C.* § 2301(a) for proposition that "the applicable post-judgment interest rate on any judgments entered in cases of personal loans is the lesser of the legal interest rate or the contract rate"); *Sequoia Presidential Yacht Gp. LLC v. FE P'rs, LLC,* 2014 WL 2610577, at *2 (Del. Ch. June 12, 2014) ("[W]here the parties have agreed to a (non-usurious) interest rate in a loan agreement, under subsection [6 *Del. C.* § 2301(a)], post judgment interest continues to accrue at this agreed-upon rate.").

[218] *See* Am. Compl. ¶ 74.

[219] Pls.' Br. at 59 n.195.

49

I consider the issue waived since the "[f]ailure to raise a legal issue in the above-the-line text of a brief generally constitutes waiver of that issue."[220] But even if not waived, Plaintiffs would still not be entitled to prejudgment interest since the right to prejudgment interest "is not self-executing[.]"[221] Our high court has explained that "[a]lthough pre-judgment interest is awarded as a matter of right, and not by judicial discretion, a party must affirmatively request this award. Prejudgment interest is appropriate 'if a plaintiff requests such an award in its pleadings or raises the issue at trial.'"[222] In another decision, our high court found that "it was error" for the trial court to award prejudgment interest where "[t]he complaint was never amended to include a demand for interest, and the matter was not raised or discussed at trial."[223]

Here, Plaintiffs did not request prejudgment interest in the Complaint. Plaintiffs also did not mention it in their motion for default judgement. Instead,

---

[220] *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *20 (Del. Ch. Mar. 28, 2018).

[221] *Whittington v. Dragon Gp. L.L.C.*, 2011 WL 1457455, at *15 (Del. Ch. Apr. 15, 2011) ("Delaware law generally holds that a successful plaintiff may be awarded prejudgment interest as a matter of right. This right is not self-executing, however." (footnote omitted)).

[222] *Chrysler Corp. v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1037 (Del. 2003) (citation omitted); *Brandywine 100 Corp. v. New Castle Cty.*, 541 A.2d 598 (Del. 1988) (ORDER) ("Although pre-judgment interest is awarded as a matter of right, that right is not self-executing, and a court may properly award pre-judgment interest only if a plaintiff requests such an award in its pleadings or raises the issue at trial."); *see also Paron Cap. Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *15 (Del. Ch. May 22, 2012) (awarding plaintiffs post-judgment interest but declining to award prejudgment interest), *aff'd*, 62 A.3d 1223 (Del. 2013); Wolfe & Pittenger § 16.09[f][1], at 16-139 ("[T]he right to pre-judgment interest is not self-executing").

[223] *Collins v. Throckmorton*, 425 A.2d 146, 152 (Del. 1980).

Plaintiffs raised it for the first time in passing in a footnote to their pre-hearing brief and did not discuss it at the Rule 55(b) hearing. Even if it were not waived, this would not be enough,[224] particularly in the default judgment context for the reasons I have described at length in this decision.[225]

## III. CONCLUSION

For the foregoing reasons, judgment will be entered in Plaintiffs' favor. Plaintiffs shall submit a form of order implementing this decision.

---

[224] *All Pro Maids, Inc. v. Layton*, 2005 WL 82689, at \*2 (Del. Ch. Jan. 11, 2005) (rejecting post-merits decision attempt to seek prejudgment interest and reasoning that plaintiff failed to "either provide fair notice to [d]efendants that it intended to seek prejudgment interest or enable the Court to conclude whether and to what extent, if any, interest . . . would be appropriate").

[225] *See, e.g.*, *Silge*, 510 F.3d at 160 (declining to award prejudgment interest in a default judgment action pursuant to Rule 54(c)); *ExxonMobil*, 221 F. Supp. 3d at 766–67 ("Rule 54(c), Fed. R. Civ. P., provides the applicable pleading standard that must be satisfied to recover pre-judgment interest in the context of a default judgment. . . . In this respect, it is dispositive that Exxon's Complaint does not specifically seek pre-judgment interest." (footnote and internal citation omitted)). But any limit the first sentence of Rule 54(c) might have on prejudgment interest in the default context would, of course, not apply to the Court's equitable authority to award prejudgment interest outside the default judgment context. *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1228–29 (Del. 2021) ("The Court of Chancery has broad equitable authority to award pre-judgment interest, including to a party that did not prevail in the litigation. The 'court may grant such relief as the facts of a particular case may require even if the prevailing party has not demanded such relief in its pleadings.'" (footnote omitted) (citing *Boush v. Hodges*, 705 A.2d 243 (Del. 1998) (citing Ct. Ch. R. 54(c)))).